James B. Sipe and Company v. Commissioner.
James B. Sipe & Co. v. Commissioner
Docket No. 20680.
United States Tax Court
1950 Tax Ct. Memo LEXIS 264; 9 T.C.M. (CCH) 154; T.C.M. (RIA) 50054; February 28, 1950
*264 Petitioner requests that the amount assigned by respondent to intangible property paid in for shares of its capital stock at par value in 1907, for the purpose of computing its excess-profits tax credit under the invested capital method, be increased to an amount determined under the formula contained in A.R.M. 34. Held: petitioner has failed to sustain its burden of establishing that it is entitled to a greater invested capital than that allowed by respondent. William J. Kenney, Esq., for the petitioner. Albert W. Dickinson, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding involves deficiencies in excess-profits taxes for the year ended December 31, 1944, and che period January 1, 1945 to September 30, 1945, in the respective amounts of $19,186.02 and $7,082.17. The sole contested issue is whether, in computing petitioner's excess-profits credit under the invested capital method, the amount attributable to intangible property paid in for capital stock exceeds $100,000. The case was submitted on a stipulation of facts and documentary evidence. The facts as stipulated are so found. Findings of Fact *265 Petitioner is a Delaware corporation with its principal office at Bridgeville, Pennsylvania. Petitioner filed its income, declared value excess-profits and excess-profits tax returns for the years ended December 31, 1940 to 1944, inclusive, and for the period January 1 to September 30, 1945, with the collector of internal revenue for the 23rd district of Pennsylvania. In 1884 James B. Sipe and Andrew G. Shade formed a partnership under the name of Shade and Sipe, Ltd. The purpose of the partnership was the development of a paint oil which when combined with paint would shorten the drying time of the paint. In 1885 Shade withdrew from the partnership and Sipe continued the development work. In 1886 Sipe perfected a combination of chemicals and oils which when combined with paint reduced the drying period from a five-day period to 10 or 12 hours. In October of that year Sipe commenced to market his product under the name of "Sipes Japan Oil." During October he sold 13 barrels. Sipes Japan Oil received prompt acceptance among consumers of paint. Sales increased until in the month of October 1887, 36 barrels, 16 gallons were sold. On April 6, 1899, Sipe caused "James B. Sipe, and *266 Company" to be incorporated under the laws of the State of Pennsylvania for the purpose of "manufacturing and selling and dealing in paint oils, paint driers and other articles * * *." It had an authorized capital stock of $25,000, consisting of 500 shares of the par value of $50 per share. Thereupon Sipe transferred all the assets owned by him and used in the manufacture of $25,000, including $7,750 for trade-marks and good will, for 496 shares of stock issued to himself and one share each to August Wigand, W. H. Staley, George T. Sipe and W. L. Ferguson. The corporation had its plant in the City of Allegheny, Pennsylvania, now a part of the City of Pittsburgh, where the drying oils were manufactured and shipped. The business of the corporation was confined to the manufacture and sale of Sipes Japan Oil and the resale of a limited quantity of pastes and other supplies as a convenience to customers. The chief market for Sipes Japan Oil was in the railroad car industry, which at that time had converted from the manufacture of wooden cars to steel cars. Sipes Japan Oil was sold to railroad car manufacturers in carload quantities. The corporation owned two tank cars with which to make *267 deliveries. The surplus net earnings and dividends paid by the corporation from April 6. 1899 to December 31, 1906, inclusive, were as follows: Earned Surplus at
Earned
Beginning of
Current
Dividends
Surplus at
Each Period
Net Income
Paid
Close of Year
Apr. 1, 1900 - net income for period from April
6, 1899 to April 1, 1900
$ 32,387.33
$32,387.33
Apr. 1, 1901 - for year
$32,387.33
24,919.78
$ 30,000
27,307.11
Dec. 31, 1901 - for 9 mos.
27,307.11
54,920.07
82,227.18
Dec. 31, 1902 - for year
82,227.18
81,044.76
75,000
88,271.94
Dec. 31, 1903 - for year
88,271.94
33,712.86
65,000
56,984.80
Dec. 31, 1904 - for year
56,984.80
15,009.21
10,000
61,994.01
Dec. 31, 1905 - for year
61,994.01
39,211.27
40,000
61,205.28
Dec. 31, 1906 - for year
61,205.28
61,654.87
25,000
97,860.15
Total
$342,860.15
$245,000
The average annual net income of James B. Sipe and Company from April 6, 1899 to December 31; 1906 was $44,240. The average invested capital attributable to tangible property for such period was $70,201.95, and the average invested capital attributable to intangible property for the same period *268 was $7,750. The average annual net income of James B. Sipe and Company for the five-year period ended December 31, 1906 was $46,126.59. The average invested capital attributable to tangible property for such period was $87,386.64, and the average invested capital attributable to intangible property for the same period was $7,750. On April 30, 1899, James B. Sipe and Company registered the trade-mark "Japan Oil" with the United States Patent Office, being No. 16,542. On February 20, 1906, the corporation registered the trade-mark "Sipes Japan Oil" with the United States Patent Office, being No. 49,863. On January 30, 1907, a new corporation, "James B. Sipe and Company," hereinafter referred to as petitioner, was incorporated under the laws of the State of Delaware, with an authorized capital stock of $175,000, divided into 3,500 shares of the par value of $50 per share. The purpose of organizing petitioner was to obtain the advantagees of Delaware corporation laws which at that time were more favorable than the laws of the State of Pennsylvania. On February 11, 1907, the old Pennsylvania corporation sold and conveyed to James B. Sipe, individually, its real estate for the sum *269 of $26,100.13, and its tangible personal property, trade-marks, formulae and good will for the sum of $19,153.20, or a total of $45,253.33. No consideration was ascribed to any of the intangible, and some items of tangible, personalty. James B. Sipe thereupon sold and conveyed to petitioner the personal property, trade-marks, formulae and good will of the Pennsylvania corporation for an aggregate consideration of $137,203.33, payable in 2,744 shares of petitioner's common stock. On February 19, 1907, the board of directors of petitioner adopted a resolution reading in part as follows: "Resolved: - That whereas, James B. Sipe is the owner of the property, trade marks, formulae and good will of the business set forth in a Schedule marked A, attached hereto and made a part hereof, and has it in his power to assign and transfer to this Corporation a good title thereto, and he has made an offer to sell the said property, trade marks, formulae and good will of the business to this Corporation for the sum of One Hundred thirty-seven thousand, two hundred dollars ($137,200.00) and accept in payment therefor, full paid capital of this Company at its par value: "And whereas, the Board *270 of Directors of this Corporation, do now after a careful consideration of the subject, declare the said property trade marks, formulae and good will of business, set forth and described in said Schedule A, to be of the fair value of One hundred thirty seven thousand two hundred dollars ($137,200.00) as shown in the enumeration thereof in said Schedule and that the said property is necessary to the business of the Corporation. "Now, Therefore, this Company hereby purchases from the said James B. Sipe, the property, trade marks, formulae and good will of the business set forth and described in said Schedule A, for the said sum of One hundred thirty-seven thousand two hundred dollars ($137,200.00) and authorizes the issue to him, or to such person and in such manner as he may in writing direct in payment of said sum, Twenty-seven hundred and forty-four (2744) shares of the capital stock of this Company, full paid up, non-assessable, which at par value amount to said sum of One Hundred thirty-seven thousand two hundred dollars ($137,200.00); and the officers of this Company are hereby empowered and directed to enter into any written or other agreement and execute all documents necessary *271 to complete this purchase and to pay for said property, etc." In Schedule A is a list of the tangible property with the specific amounts opposite each item. The total value given to the tangible property was $37,203.33. The intangible property, listed as trade-marks and formulae used by the Pennsylvania corporation, the exclusive right to use the same, and the good will of the business of said company, was given a value of $100,000. The actual fair market value of the tangible personal property so transferred was, on February 19, 1907, $37,203.33. There were no known sales of the stock of petitioner within 10 years after its incorporation, or of stock of the predecessor Pennsylvania corporation since its incorporation. On July 15, 1907, an action was commenced in the Federal District Court for the Southern District of New York, in which the Pennsylvania corporation and petitioner were plaintiffs and the Columbia Refining Company was defendant. The action was based upon a violation of the confidential relationship by a former employee of the Pennsylvania corporation, who had become employed by Columbia Refining Company, and upon the infringement of the trade-mark "Japan Oil" *272 by the trade-mark "Japinol" used by the Columbia Refining Company. The action sought an injunction and an accounting for profits to date of the Bill of Complaint. On May 6, 1910, prior to trial, a consent decree was entered whereby Columbia Refining Company was enjoined from using the word "Japinol" and was compelled to pay the sum of $11,000 in lieu of profits made by reason of the infringement. Opinion The sole question presented is the fair market value to be assigned to the intangible property acquired by petitioner for its capital stock, in computing its excess-profits credit under the invested capital method. Equity invested capital is defined by section 718 (a) of the Internal Revenue Code. [1] Where property is paid in for stock, it is to be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange, which, in the instant case, is cost. Sec. 113 (a) (14). Where the basis is cost and the property was acquired for stock, cost is the fair market value of the stock at the time of its issuance. In the event the stock had no established market, as has been here shown, the cost is the fair market value of the tangible *273 and intangible property acquired. Regulations 112, section 35.718-1. Petitioner contends that since there was no established market for its stock, the fair market value of its intangible property acquired for its stock should be computed under the formula contained in A.R.M. 34 ( 2 C.B. (1920) 31-33). By the use of such formula petitioner arrives at the figure of $260,000, which it argues is the fair market value attributable to its intangible property received in exchange for its shares of its capital *274 stock. The respondent, in determining his deficiency, assigned a value of $100,000 as the fair market value of the intangible properties acquired by petitioner in 1907 in exchange for its par value shares. Petitioner's board of directors at the time it agreed to purchase such property fixed the fair value of the tangible property at $37,203.33, and the intangible properties at $100,000. The respondent adopted both such valuations. It has been stipulated that the actual fair market value of the tangible personal property was $37,203.33, as determined by the directors. The controversy involves only the fair market value to be assigned to the intangibles transferred. Petitioner is a Delaware corporation. Section 14 of the Delaware corporation law provides, in substance, that the purchase of capital stock of any corporation having shares of par value may be paid for wholly or partly in cash, labor, personal property, real estate or leases thereof and, in the absence of actual fraud in the transaction, the judgment of the directors as to the value thereof shall be conclusive. While the action of the directors in fixing the value of property to be paid for by the issuance of its par *275 value stock is not controlling in this proceeding, we think that since, under the local law, their judgment as to the value is conclusive in the absence of fraud, the burden is upon petitioner of showing that the directors did not exercise their judgment in good faith. There is no evidence in this record which in any manner reflects on the good faith of such directors. Evidence which consists of the balance sheet and the net income of a predecessor corporation which previously owned and used such property falls short of meeting such burden. Petitioner apparently relies upon the premise that if the intangible property were valued under A.R.M. 34, it would result in reaching a higher valuation than that fixed by the directors. Conceding that this and other courts have, in varying instances, applied the formula contained in A.R.M. 34, as evidenced by such cases as Ushco Mfg. Co. v. Commissioner, 151 Fed. (2d) 821; White & Wells Co. v. Commissioner, 50 Fed. (2d) 120; John Q. Shunk, 10 T.C. 293; reversed on another point, 173 Fed. (2d) 747, and many others, its application has been limited to situations where there existed no other *276 intrinsic evidence upon which to base a finding of the fair market value. We have refused to apply such formula where the value has been fixed in an arm's length transaction. McKinney Manufacturing Co., 10 T.C. 135. Petitioner argues that there existed here no arm's length transaction, since it made no difference to James B. Sipe, who was exchanging his property for capital stock of petitioner, what valuation the board of directors placed upon the property. We do not agree. The directors of a corporation act in a fiduciary capacity. In acquiring property in exchange for capital stock, the corporate directors, as in all their official duties, are in law presumed, in the absence of impugning evidence, to have acted in good faith. Here there is no such evidence. In fact, the evidence is the other way. The resolution approving the purchase of the property recites that after careful consideration they determined the fair value of the intangible property to be $100,000. The fixing of such a substantial sum, when the property had previously been carried on the balance sheet of the predecessor company at $7,750, is convincing proof that the directors were familiar with all the *277 facts and circumstances necessary for them to determine the fair market value, and acted accordingly. In the absence of any evidence of the fair market value of the intangible property acquired by petitioner for its capital stock, other than the balance sheets and earnings of the predecessor corporation, we think there is no sound basis for adopting a value computed under A.R.M. 34 in lieu of the bona fide judgment of the directors as to the value of such property on the critical date. We, therefore, conclude, upon this record, that petitioner has not sustained its burden of establishing that it is entitled to a greater invested capital than that allowed by the respondent. Decision will be entered for the respondent. Footnotes
1. SEC. 718. EQUITY INVESTED CAPITAL. (a) Definition. - The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b) - (1) Money Paid In. - Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital; (2) Property Paid In. - Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. * * *↩